# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lisa M. Brabbit, as Trustee for the
next-of-kin of Richard Bild,

                    Plaintiff,

v.

Frank Capra, in his individual capacity
as a Washington County Jail Sergeant;
Stephanie Kaphing, and Cayci Nelson, in
their individual capacities as Washington
County Jail nurses; Katelyn Schlief, Vince
Scheele, and Chris Stellmach, in their
individual capacities as Washington
County Jail Correctional Officers; Roger
Heinen, in his official capacity as the
Washington County Jail Commander; and
Washington County,

                    Defendants.

Civil No. 19-3062 (DWF/ECW)

**MEMORANDUM
OPINION AND ORDER**

---

Andrew J. Noel, Esq., Kathryn H. Bennett, Esq., Marc Betinsky, Esq., and Robert
Bennett, Esq., Robins, Kaplan LLP; and Jeffrey M. Montpetit, Esq., Sieben Carey,
counsel for Plaintiff.

Aaron Mark Bostrom, Esq., Andrew A. Wolf, Esq., Jason M. Hively, Esq., and
Stephanie A. Angolkar, Esq., Iverson Reuvers Condon, counsel for Defendants.

---

## INTRODUCTION

This case arises from Richard Bild's ("Bild") suicide by jumping while he was

detained at the Washington County Jail ("WCJ").  Plaintiff Lisa M. Brabbit, as a third-

party trustee for Bild's next-of-kin, brought the action against Washington County, Roger

Heinen in his official capacity as the Washington County Jail Commander, as well as

individual defendants—Jail Nurses Stephanie Kaphing and Cayci Nelson, Sergeant Frank

Capra, and correctional officers ("CO") Katelyn Schlief, Vince Scheele, and Chris

Stellmach.  This matter is before the Court on Defendants' Motion for Summary

Judgment.  (Doc. No. 29.)  For the reasons set forth below, the Court denies the motion in

its entirety.

## BACKGROUND

On June 26, 2018, the Forest Lake Police Department responded to a report that an

individual, later identified as Bild, had crashed his car into the home of Jennifer Laine,

Bild's wife.[1]  (Angolkar Decl. ¶ 2, Ex. 1 ("Smith Dep.") at 9-10; Noel Decl. ¶ 2, Ex. 1

(Incident Report).)  Officer Matthew Smith arrived and realized immediately that Bild

was experiencing a serious mental-health episode.  (Smith Dep. at 11.)  Bild was in the

garage entry door and there was a fire in the garage.  (*Id.* at 14-15.)  Officer Smith tried to

deescalate the situation and convince Bild to come out of the building.  (*Id.*)  Bild told

Officer Smith that he was "trying to die" and was "prepared to die" and Officer Smith

believed that Bild was suicidal.  (*Id.*)  Bild threatened to blow up the building and told the

---

[1]     The record shows that Bild was married to Laine from 2015-2016 and again
shortly before his death.  (Doc. No. 35 ("Angolkar Decl.") ¶ 3, Ex. 2 ("Laine Dep.")
at 6-8, 17-18.)  To prevent confusion, the Court refers to Jennifer by her surname Laine.

The record also shows that Bild had suffered from substance abuse and mental
health problems.  (Doc. No. 41 ("Noel Decl.") ¶ 3, Ex. 2 ("Medical Records"); Laine
Dep. at 18.)  Bild had received treatment from Nystrom & Associates ("Nystrom") and
attempted suicide before he was placed in jail in June 2018.  (Laine Dep. at 18-19.)  The
issue of whether any of the Defendants were aware of Bild's past, aside from information
learned during or after intake, did not play a role in the Court's decision.

officers that he had poured a mixture of gasoline and oil on the floor and himself and that he planned to set himself on fire.  (*Id*. at 16.)  Officer Smith noticed that there was a fire inside of the garage and smoke coming out from the southwest corner of the garage.  (*Id*. at 15-18.)  Officer Smith warned Bild and then fired less-lethal rounds.  (*Id*. at 19.)  Bild retreated into the garage but eventually came back out.  (*Id.* at 20.)  Bild was taken into custody.  (*Id*. at 17, 20.)  Bild's hands were burned and soot covered his upper body.  (*Id*. at 16-17.)  Bild also smelled strongly of gasoline and his clothing was "completely soaked" with gas.  (*Id*. at 17.)  Bild told Officer Smith that he had been on a "long drug-and-alcohol bender and he hadn't slept in days, and that he did not feel right and could not think right."  (*Id*. at 18.)  Bild also told Officer Smith that he went into the garage to hurt himself and that he was trying to die at the house.  (*Id*. at 29.)

Bild was booked into the jail shortly after 2 p.m.  (Doc. No. 31 ("Heinen Decl.") ¶ 2, Ex. 1.)[2]  At 2:07 p.m., Officer Kayla Tebelius conducted Bild's initial intake and medical screening.  When she asked Bild whether he had any medical issues, he stated, "I sure f***ing do."  (Angolkar Decl. ¶ 4, Ex. 3 ("Capra Dep.") at 71-74.)  A couple of minutes later, Defendant Sergeant Frank Capra walked in and observed that Bild was burned, covered in soot, and smelled strongly of gasoline.  Sergeant Capra directed Officer Tebelius to call for the nurse.  (Capra Dep. at 72-74.)

---

[2]     The record contains a copy of the CCTV video from WCJ, as well as recordings of phone calls referenced in the briefs, *see* Heinen Decl. ¶ 3, Ex. 2.  The Court has reviewed the relevant portions of the video and phone call recordings, both of which inform the recitation of the background facts throughout this order.

Nurses Cayci Nelson and Stephanie Kaphing responded and saw Bild shortly after 2:00 p.m.  (Angolkar Decl. ¶ 5, Ex. 4 ("Nelson Dep.") at 107.)  Nelson smelled gasoline, asked Bild to shower, and then treated burns on Bild's hands.  (Nelson Dep. at 19, 107.)  Kaphing could also smell gasoline.  (Angolkar Decl. ¶ 12, Ex. 11 ("Kaphing Dep.") at 130.)  Bild told Nelson that he had inhaled smoke.  (Nelson Dep. at 13-14.)  Bild and Nelson discussed blisters on Bild's hands and Bild joked about punishing himself by picking at his blisters.  (*Id*. at 14-15.)  Nelson did not interpret this as threatened self-harm.  (*Id*. at 115-117.)  Nelson treated the burns on Bild's hands and contacted Dr. Joel Jenson, who provides medical care to inmates, to discuss Bild's physical injuries.  (*Id*. at 16.)  Nurse Nelson claims she was not initially aware that Bild had attempted suicide, but instead had been told that Bild tried to blow up his girlfriend.  (*Id*. at 17-18.)

At 2:58 p.m., Bild was placed in a small room with six other inmates.  (Angolkar Decl. ¶ 6, Ex. 5 ("Dr. Boesky Report") at 23.)  At 3:03 p.m., Bild and six other inmates were moved to a "pre-booking" room.  (Boesky Report. at 24.)  Bild appeared to interact with the other inmates, use the telephone, and watch television.  (*Id*. at 23-25.)

At 4:00 p.m., Bild was removed from the "pre-booking" room and treated by Nelson and Kaphing.  By this time, Nelson had learned that Bild may have attempted suicide, and she placed Bild on "High Observation" watch status.[3]  (Nelson Dep.

---

[3]     "High Observation" status (or "HO" status) can be used for inmates that jail personnel are concerned about for a variety of reasons, including mental-health issues. (Nelson Dep. at 82.)

at 19-20.)  She did not contact any other medical personnel to discuss or assess Bild's

suicide risk.  (*Id*. at 20.)  At 4:44 p.m., Nelson noted in part:

> Pt also placed on HO r/t the reason he's here in that it may have been a
> [suicide attempt.]  [Sergeant] and Intake staff aware. [Bild] placed on ["sick
> call"] schedule for HO assessment and possible drsg change tomorrow.  Pt
> verbalizes understanding and is agreeable to POC.

(Angolkar Decl. ¶ 7, Ex. 6 (June 26, 2018 Chart Note).)  On the Observation Form,

Nelson also noted that the reason for placing Bild on HO status was a "possible [suicide

attempt] prior to arrest" and further that Bild "denies [suicidal ideation/self-harm]."

(Angolkar Decl. ¶ 8, Ex. 7.)  Bild was not given an anti-suicide gown or blanket and was

not restricted from having other potentially harmful items.  (*Id*.)  At this time, Nelson did

not consider placing Bild on suicide watch (also called "Special Close Watch ("SCW")").

(Nelson Dep. at 82, 119-20; Kaphing Dep. at 12-13, 69.)

At 4:10 p.m. and 4:28 p.m., Bild made two phone calls to Laine and left a message

each time.  Later, Bild reached Laine and they argued about the events of that night and,

when Laine asked Bild what would happen now, Bild answered that he would find a way

to kill himself.  CO Christopher Ahles heard from a sergeant that Bild called Laine and

made suicidal comments.  (Angolkar Decl. ¶ 9, Ex. 8 ("Ahles Dep.") at 15.)  After

consulting with medical staff, and at approximately 5:48 p.m., CO Ahles searched Bild

and dressed him in a suicide gown.  (Ahles Dep. at 15-17.)  CO Ahles saw injuries and

"some black stuff" on Bild's hands.  (*Id*.  at 11.)  CO Ahles noted that Bild explained that

he had set a house on fire and expressed remorse.  (*Id*. at 12.)

Bild was placed in a "multi-hold" cell[4], where he remained for three hours without incident.  At 6:15 p.m., Nurse Kaphing, who had been alerted to Bild's suicidal comments to Laine, elevated Bild's suicide precaution level to "Special Close Watch" because of the comments and "recent suicide attempt."  (Angolkar Decl. ¶ 11, Ex. 10.)  He was placed on the "sick call" list, to be seen by a nurse the following day.  (Doc. No. 41 ("Noel Decl.") ¶ 11, Ex. 10.)

At 9:10 p.m., CO Katelyn Schlief formally processed the intake of Bild.  CO Schlief observed Bild in a suicide gown, knew he attempted to start a house fire, smelled gasoline in the intake area, and observed a burn on Bild's hand.  (Angolkar Decl. ¶ 10, Ex. 9 ("Schlief Dep.") at 72; *id.* ¶ 13, Ex. 12 ("Intake Questionnaire").)  During the intake process, Bild indicated that he had previously been hospitalized for mental health issues related to a suicide attempt, that he had been treated for depression, and that he had attempted suicide by taking pills in the past.  (Schlief Dep. at 72-76.)  Bild denied taking any medication for depression, stated he did not have a social worker, and claimed that he had not been hospitalized within the prior five years.  (*Id.*)  When asked if he felt like killing or harming himself right now, he answered "yes" and stated that he "tried to before coming to jail."  (*Id.* at 73-74.)  CO Schlief noted that Bild was "currently on [Special Close Watch] right now in the green gown" and that Bild "[s]ays he wants to kill self but claims he won't do it."  (Schlief Dep. at 78-80; Intake Questionnaire.)  CO

---

[4]     The "multi-hold" cell is located in the intake area and has glass walls that allow staff to monitor the cell.  (Capra Dep. at 40.)  The "multi-hold" cell and C400 were the housing options used for suicidal inmates.  (Nelson Dep. at 76.)

Schlief did not believe that Bild had an obvious need for medical attention and did not contact an outsider provider.  Instead, CO Schlief placed Bild in the lower tier of C400[5], where he was dressed in a suicide gown and not given any toiletries or other objects. (Schlief Dep. at 49-50.)  CO Schlief did not consult with Kaphing before placing Bild in C400.  (Kaphing Dep. at 30-31.)

The C400 cellblock is a two-story area that contains six cells—three on the lower tier and three on the upper tier.  (Schlief Dep. at 48-49, 117.)  The stairway from the lower level to the upper level has an intermediate landing that then turns 90 degrees to lead up the remaining way.  The top tier has a protective barrier on the bannister—one side with a solid glass barrier and the other side (over the portion of the stairwell leading up beyond the landing) has a metal fencing barrier.

---

[5]     C400 is designated for male inmates with mental health concerns, including suicidality.  (Angolkar Decl. ¶ 14, Ex. 13 ("Stellmach Dep.") at 84.)

Below is an image of the stairway in C400 as of June 2018:



(Heinen Decl. ¶ 16.)

Inmates housed on the lower level are not permitted on the upper level.  (Schlief
Dep. at 49; Stellmach Dep. at 52.)  The cells in the C400 block, as well as a shared
dayroom on the first floor, are monitored via video.  (Capra Dep. at 41-42.)  The dayroom
contains chairs and a television.  Outside the cellblock is a "cluster" desk, from which
COs could view the inmates through glass windows.

Bild was taken to his cell (C402) at 10:02 p.m., where he interacted with other
inmates until he retired to his cell for the night.  Bild's cell was continuously monitored
via camera, two officers monitoring the unit through large windows and monitors, and
direct observation every 30 minutes.  (Stellmach Dep. at 20-21, 36, 90; Heinen Decl.
¶ 6, 7, Exs. 5, 6.)  One inmate with whom Bild interacted was Vanholy Var ("Var").
(Angolkar Decl. ¶ 15, Ex. 14 ("Var Dep.") at 7-8.)  When Bild first arrived, Var noticed
that he was wearing a suicide gown.  (*Id*.)  Bild interacted with Var in the dayroom.  (*Id*.
at 9-10.)  Bild talked about his family and told Var repeatedly that he wanted to die.  (*Id*.
at 9-11.)  Var observed that Bild could not stay still, had bad anxiety, that his eyes were
always wandering, and that he "wasn't normal."  (*Id*. at 35-38.)  Var claims that he told a
female CO that he was "worried about" Bild because he was "acting funny" and was "not
himself."  (*Id*.)  Defendants assert that there is no video evidence of such a conversation.
Var did not talk to any other officers about his concerns about Bild.  (*Id.* at 12.)  For the
rest of the morning, Bild ate breakfast, cleaned the dayroom, and watched television.
Bild also called his mother, during which his mother told him that she was setting up
hospice care for her husband and that she did not know who to call for bail.

At 10:08 a.m. on June 27, 2018, Bild met with Nurse Kaphing. She checked his burn wounds, looked for signs of opiate withdrawal, and evaluated his watch status. (Kaphing Dep. at 82-83.) Kaphing noted that Bild's watch status was elevated because he "made contact with his victim via phone and made suicidal comments." (Angolkar Decl. ¶ 16, Ex. 15.) Bild told Kaphing that he still had suicidal thoughts and although he did not have a plan, he was "always keeping his eyes open." (*Id*.; Kaphing Dep. at 85-86.) He also stated that if he had really wanted to die, he would have stayed inside the burning house. (Kaphing Dep. at 85-86.) Kaphing noted that Bild had "significant" substance abuse, lack of impulse control, and suicidality. (*Id*. at 73.) Kaphing noted:

> Substance abuse/dependence is significant and unclear. Impulse control is significant and unclear. Suicidality is significant and unclear. Patient is not responding to treatment plan. The patient is compliant with the treatment plan. The patient is cooperative and communicative.

(Angolkar Decl. ¶ 16, Ex. 15.) Kaphing recommended that Bild remain on suicide watch. (Kaphing Dep. at 88.)

At 12:35 p.m., Bild called his mother for a second time to ask about bail. For the remainder of that day, Bild used the phone multiple times, watched TV, interacted with other inmates, ate meals, and read the newspaper. At 5:56 p.m., Bild talked to his mother a third time during which time they discussed his court date and he shared contact information about a bail bonds company. Bild's mother indicated that Bild could not stay with her and her husband, and she shared that Bild's sister could help him get into Teen Challenge.

On June 28, 2018, Bild ate breakfast, watched television, and helped clean. Bild left a voice message for Laine giving her information on his court date and expressed his hope that she would be there. At 9:30 a.m., Bild changed into standard prison clothes and left for a criminal court appearance, at which he was required to post a $75,000 bond with conditions, including psychological and chemical-dependency evaluations. (Heinen Decl. ¶ 8, Ex. 7.) After his court appearance, Bild returned to C400, at which time he interacted with inmates, watched TV, and used the phone. At 1:35 p.m., Bild left a voicemail for his mother telling her that bail was set at $75,000 and that he could come up with about $1,500 when he got out. At 2:14 p.m., Bild spoke with a bail bond company.

Nurse Kaphing met with Bild again that afternoon. Bild indicated that he just wanted to pay his bail, go see his dad, and wear regular clothes. (Kaphing Dep. at 38.) Bild told Kaphing he would not hang himself and that a gown would not stop him if he wanted to commit suicide, but that was not what he wanted. (*Id*. at 37-38.) Kaphing noted that when asked about harming himself, Bild was pleasant, cooperative, and serious. (Angolkar Decl. ¶ 18, Ex. 17.) Kaphing noted that Bild's suicide risk was "significant and improved." (*Id*.) Kaphing decreased Bild's watch status from SCW to HO watch. (*Id*.) Kaphing also evaluated Bild's opiate detoxification, recording that Bild had elevated blood pressure and pulse, and that he complained that he was "feeling like 'he was crawling out of his skin.'" She also reported that Bild was "hypercommunicative." (*Id*.) Kaphing concluded:

> Anxiety is not significant.  Cognitive issues are not significant.  Depression is not significant.  Suicidality is significant and improved.  Mania/manic behavior is significant and unclear.  Patient is responding to treatment plan.  The patient is compliant with the treatment plan.  The patient is cooperative and communicative.

(*Id*.)  After being placed on HO, Bild was permitted to have regular jail clothing and other items.  However, Kaphing restricted Bild from having unsupervised access to a razor, worried that he might harm himself.  (Kaphing Dep. at 72.)

Bild was given traditional prison clothes.  Bild remained on the cell block, during which time he called a bail bonds company and his mother several times, who indicated that Bild's family would not be able to put up money for bail, but that Bild's sister, Tammy Heinisch ("Heinisch"), would support Bild in Court if Bild agreed to drug treatment.  Bild also spoke with Heinisch at 6:34 p.m.  (Angolkar Decl. ¶ 19, Ex. 18 ("Heinisch Dep.") at 13-14.)  Heinisch urged Bild to acknowledge that he had addiction issues and to go to Teen Challenge.  (*Id*.; Heinen Decl. ¶ 3, Ex. 2.)  Bild told Heinisch that people were proving his worth by not trying to get him out and he hung up on Heinisch.  (*Id*.)  Heinisch called the jail and told an officer that she was concerned about Bild attempting suicide.  (Heinisch Dep. at 14.)  An officer called Heinisch at about 10 p.m. and informed her that he would review Bild's phone call recordings and assured her that Bild was safe and being monitored.  (*Id*. at 16.)

On June 29, 2018, a cleaning cart was brought into C400 cellblock for inmate chores.  Bild ate breakfast with other inmates and participated in the morning routine.  Bild is seen on video fiddling with a broom handle.  Bild was sitting with Var when Var saw Bild try to unscrew a mop handle from the cleaning supply area.  Var testified that

Bild told him that he wanted to use the mop to place in his mouth and jump from the upper tier.  (Var Dep. at 15.)  Var attempted to calm Bild.  (*Id*.)  Var did not report this to any jail personnel, but testified that he used his body language while facing the cluster desk to signal that Bild was "up to no good."  (*Id*. at 19-21.)  Nelson was at the desk at the time and video appears to show her looking in the direction of Var.  Var then moved a chair and sat in between the cleaning cart and the staircase.

That morning, the jail blocked Heinisch's and Bild's mother's phone numbers. (Heinisch Dep. at 14-15; Angolkar Dep. ¶ 22, Ex. 21 ("Watkins Dep.") at 15-16.)[6]  Bild asked Officer Stellmach why the numbers were blocked, and Officer Stellmach told him that his sister and mother had made the request.  (Stellmach Dep. at 85.)  Bild then went to his room and is seen reading.

At 9:36 that morning, Bild met with Nurse Kaphing.  (Kaphing Dep. at 29; Angolkar Decl. ¶ 20, Ex. 19.)  Nurse Kaphing noticed a change in Bild's attitude from the day before—he was "doing worse" and his outlook was not as optimistic.  (Kaphing Dep. at 29.)  Bild told Nurse Kaphing that he was not able to get bail money and that he accepted that he would be in jail until he died.  (*Id*. at 28-29.)  Kaphing noted that Bild seemed less cheerful and mostly talked about how he would not get out of jail.  (*Id*. at 114, 117.)  Bild, however, also talked about his sister and placement at an alcohol and

---

[6]     The numbers were blocked at the request of Heinisch.  (Heinisch Dep. at 14-15.) Sergeant Capra reported that at 7:53 a.m. that morning, he had received a phone call from Heinisch asking that the jail block Bild from being able to call her or her mother.  (Noel Decl. ¶ 19, Ex. 18.)

drug rehabilitation center.  (*Id*. at 29-30.)  Kaphing noted that he was "forward thinking."  (*Id*. at 29-30.)  He also told Kaphing that if he wanted to commit suicide in jail, he would have done so already.  (*Id*. at 115-16.)  Kaphing did not believe that Bild was actively suicidal, but still considered him at risk, kept him on HO, and planned to follow up the next day.  (*Id*. at 112, 117.)  Bild also asked about starting hydroxyzine, to which Kaphing agreed to discuss with Dr. Jenson.  (*Id*. at 90-91, 117.)  Kaphing also assessed his detoxification, noting that Bild was feeling anxious and "creepy crawly" in his skin, was feeling claustrophobic and on the "brink of a panic attack," and that he asked about medication for anxiety.  (Angolkar Decl. ¶ 20, Ex. 19.)  Kaphing noted that Bild's "[s]uicidality is significant and unclear."  (*Id*.)

After his visit with Nurse Kaphing, CO Vince Scheele patted Bild down.  (Scheele Dep. at 49.)  At 10:17 a.m., COs Scheele and Stellmach saw Bild walk up the stairs to the second floor.  (Scheele Dep. at 62; Stellmach Dep. at 80.)  CO Scheele told Bild to get down.  Bild laughed and complied.  (Scheele Dep. at 62; Stellmach Dep. at 81.)[7]  The COs did not discuss the incident with Bild or contact a nurse.

Bild ate lunch with other inmates and interacted with others in the dayroom.  By 12:39 p.m., only Var and Bild remained in the dayroom.  Bild tried to give Var a note to

---

[7]     CO Steele testified that while against the rules, going up the stairs does not trigger discipline.  (Steele Dep. at 41.)  CO Stellmach explained that inmates sometimes go upstairs to be alone or to signal to inmates in other cell blocks.  (Stellmach Dep. at 56; Steele Dep. at 42.)  CO Stellmach also testified that inmates on special close watch or high observation status are not allowed to walk up the stairs and, if they do, the Sergeant or medical staff is not alerted unless the inmate begins to climb the railing as if they were attempting to jump.  (Stellmach Dep. at 56.)

give to Bild's wife.  (Var Dep. at 15-16.)  Var did not read the note and told Bild that he did not want to get involved.  (*Id*. at 16.)  Bild tried to use the phone and again asked Var about the note.  (*Id*. at 16.)  Bild was sitting with his legs up, watching TV when he suddenly stood up and ran past Var, removed his sandals, and proceeded up the stairs toward the second floor.  (Boesky Rep. at 86.)  Bild climbed over the railing (at the 90 degree turn of the stairway).  Var saw that Bild had a pencil in his nose.  (Var Dep. at 17.) Fearing that Bild was planning to jump, Var tried to talk him down.  (*Id*.)  Var looked toward the window where the officers were observing the room.  (Var Dep. at 17.)  Var yelled "Don't do this!" to Bild.  (*Id*.)  Officer Scheele entered and made a call on the radio.  (Scheele Dep. at 75.)  More officers arrived as Bild moved along the outside of the barrier and Var continued to try to talk Bild down.  (Var Dep. at 18.)  Bild stated that he wanted to "out himself."  (*Id*.)

Officers brought in first aid equipment and began moving a large gym mat into the dayroom.  (Stellmach Dep. 76.)  Bild spent roughly three minutes on the railing, during which time he sounded "very frantic" and "very serious" about jumping.  (Stellmach Dep. at 78-79.)  Bild jumped head-first off from the second floor before the officers could position the mat below him.  Bild landed on the concrete floor.  (Var Dep. at 18.)  Jail personnel immediately rushed to provide medical aid to Bild.  They placed Bild on a backboard and EMS arrived at 12:58 p.m.  Bild was transported to Regions Hospital where he died at 5:05 p.m."  (Heinen Decl. ¶ 10, Ex. 9 at 42-45.)

Plaintiff submits evidence of prior jumping incidents at the jail.  In particular, four such incidents occurred in 2016 and 2017.  (Angolkar Decl. ¶ 32, Ex. 31.)  Plaintiff also

submits evidence that such jumping incidents occurred at WCJ at a higher rate of

frequency than other jails.  (*Id*.; Heinen Dep. at 40.)  Jail personnel had large mats from

the gym called "jump mats" that could be used to cushion the fall of an inmate who might

jump.  (Nelson Dep. at 67; Kaphing Dep. at 36-37, 80; Capra Dep. at 84.)

The record also contains evidence regarding WCJ's medical and mental-health

services and procedures, which are summarized here.  The primary providers of inmate

healthcare were the jail's nurses.  (Noel Decl. ¶¶ 6, 7, 8, Exs. 5, 6, 7; Heinen Dep.

at 110-11.)  If necessary, the nurses would schedule inmates to see the jail's contracted

doctor, Dr. Joel Jensen, who was at WCJ on Tuesdays and Thursdays.  (Nelson Dep.

at 21-22.)  The jail also enacted a Mental Health Services Policy.  (Noel Decl. ¶ 9, Ex. 8.)

The Policy's purpose was to "ensure that all inmates have access to mental health

services and that inmates identified as needing these services are referred appropriately"

and provided for a "variety of psycho-social and pharmacological therapies . . . to

alleviate symptoms, attain appropriate functioning and prevent relapse."  (*Id*.)  The jail

contracted with Nystrom to provide mental health services, including assessment,

diagnosis, treatment, prescription review, developing or revising care plans, and advising

correctional health staff on symptom monitoring and suicide watch.  (Angolkar Decl.

¶ 26, Ex. 25.)  Similar to the provision of health care, the jail nurses would place an

inmate in need of mental health care on a list to be seen by a Nystrom practitioner who

was at the jail on Thursdays.  (*Id*.; Angolkar Decl. ¶ 27, Ex. 26 ("Leibel Dep.") at 97;

Noel Decl. ¶ 9, Ex. 8.)  Jail nurses could also consult with Nystrom outside of regular

hours in case of emergency and could send inmates to Regions Hospital for emergent

mental-health services.  (Nelson Dep. at 25.)  With respect to suicide prevention, the jail had enacted several policies, which recognized that the risk of suicide is higher in jails than in the general population and is the leading cause of death in jails.  The policies each utilized jail nurses to screen inmates for further assessment.  (Angolkar Decl. ¶ 24, Ex. 23; *id*. ¶ 25, Ex. 24; Heinen Dep. at 63, 110; Noel Decl. ¶ 5, Ex. 4.)  The record demonstrates that, with respect to the use of putting inmates on, or taking them off, of suicide watch, jail policy delegated the responsibility to the nurses.  While Nystrom was available to assist with mental-health issues, the jail's practice was not to alert the provider when an inmate is on suicide watch.  (Kaphing Dep. at 88-89.)

In Counts One through Seven of the Amended Complaint (Doc. No. 4), Plaintiff alleges Eighth and Fourteenth Amendment violations pursuant to 42 U.S.C. section 1983 against the individual defendants.  In Count Eight, Plaintiff alleges a *Monell* claim against Washington County and Commander Heinen in his official capacity.[8]

## DISCUSSION

### I.      Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

---

[8]      Plaintiff's claims against Christopher Ahles (Count 3) and for Failure to Train (Count 9) have been dismissed with prejudice.  (Doc. No. 46.)

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d

at 747.  The nonmoving party must demonstrate the existence of specific facts in the

record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953,

957 (8th Cir. 1995).  A party opposing a properly supported motion for summary

judgment "may not rest upon the mere allegations or denials of his pleading, but must set

forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Qualified Immunity

Plaintiff asserts deliberate indifference claims under the Eighth and Fourteenth

Amendments against Sergeant Capra, COs Schlief, Scheele, and Stellmach, and nurses

Kaphing and Nelson.  These defendants all argue that they are entitled to qualified

immunity.  The doctrine of qualified immunity protects state actors from civil liability

when their "conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982).  The defense provides "ample room for mistaken judgments" as it protects

"all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of deprivation. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). The Court has discretion to decide which qualified immunity prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violated that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## III.    Deliberate Indifference

Plaintiff asserts that Defendants were deliberately indifferent to Bild's serious mental health needs and serious risk of suicide based on the Eighth and Fourteenth Amendments. "Prisoners have a 'clearly established constitutional right to be protected from the known risks of suicide and to have [their] serious medical needs attended to.'" *Whitney v. City of St. Louis*, 887 F.3d 857, 860 (8th Cir. 2018) (citation omitted). The Eighth Amendment prohibits jail officials from acting with deliberate indifference to risks of suicide, and the Fourteenth Amendment extends that protection to pretrial detainees. *Id*. (citations omitted); *see also Coleman v. Parkman*, 349 F.3d 534, 538 (8th

19

Cir. 2003); *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005) (applying deliberate indifference standard to pretrial detainee's claims; noting plaintiff alleged that officials acted with deliberate indifference), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Deliberate indifference requires two evidentiary showings—one objective and one subjective. *See, e.g.*, *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). Each can be demonstrated in "the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). The objective component requires a plaintiff to demonstrate that he had an objectively serious medical need. *See Grayson v. Ross*, 454 F.3d 802, 809-09 (8th Cir. 2006). Here, Defendants concede (for the purposes of this motion), that Plaintiff had a serious medical need based on his risk of suicide, placement on SCW and HO, and housing assignment in C400. (Doc. No. 34 at 34.) Therefore, the Court turns to the subjective component of the deliberate indifference inquiry.

The subjective competent requires a plaintiff to show that the defendant actually knew of, but disregarded, the plaintiff's serious medical need. *Grayson*, 454 F.3d at 808-09. Deliberate indifference is more than negligence but does not require a plaintiff to show a jail official "purposefully cause[ed] or knowingly [brought] about a substantial risk of serious harm." *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011). And while a showing that the risk of suicide is obvious is not enough to demonstrate actual knowledge, such evidence can serve as circumstantial evidence of knowledge. *See Coleman*, 349 F.3d at 538 & n.3. An obvious risk of harm "justifies an inference that a

prison official subjectively disregarded a substantial risk of serious harm to the inmate."
*Schaub*, 638 F.3d at 915. The Court also evaluates the defendants' responses of measures
to abate the known risk.

### A.    Nurses

Defendants argue that there is no evidence in the record that the nurses had actual
knowledge and were deliberately indifferent to a general risk of suicide. Instead,
Defendants argue that both Nelson and Kaphing appropriately responded to Bild's
medical needs and potential risk of suicide. In particular, Defendants claim that Nelson,
who was involved in Bild's medical care at intake, did not immediately realize that Bild
was at risk of suicide because she was focused on treating his burns and that she was not
"fully aware" of Bild's suicide risk when she spoke with Dr. Jensen. Defendants submit
Nelson was only aware that Bild may have attempted suicide by the time she met with
him a second time, at which point she placed him on HO watch status. Defendants
further assert that Kaphing, who was involved with Bild's intake and subsequent follow-
up care, appropriately responded to his medical needs. Defendants point out that
Kaphing was told about Bild's suicidal statements and increased Bild's watch status to
SCW and placed him in a suicide gown. Defendants also submit that Kaphing's actions
after the initial intake were appropriate, underscoring that some of Bild's behaviors were
routine and did not suggest that he was at high risk of imminent suicide. For example,
Defendants submit that Bild watched television, interacted with inmates, made phone
calls, and otherwise acted normally, such that there was no evidence to show that the staff
had actual knowledge of, and was deliberately indifferent to, a genuine risk of suicide.

In sum, Defendants argue that there was no apparent need at intake or thereafter for Bild to be transferred to a hospital or referred for a mental-health assessment and that the nurses' responses to Bild's needs were appropriate.  In so arguing, Defendants emphasize that disagreement over the provision of medical care does not establish indifference.  *See Lair v. Oglesby*, 859 F.2d 605, 606 (8th Cir. 1988 ("Mere disagreement with medical treatment, however, does not constitute a constitutional violation.").  Defendants also point out that when evaluating a deliberate indifference claim, the standard is not whether the best care is provided and officials are not required to provide a suicide-proof institution.  *See, e.g.*, *Luckert v. Dodge Cnty.*, 684 F.3d 808, 818 (8th Cir. 2012).

Plaintiff, on the other hand, points to evidence in the record that both Nelson and Kaphing knew that Bild was suicidal.  For example, Bild arrived at the jail with burn injuries and covered in gasoline, and he made statements that expressed a desire for self-harm.  Moreover, on the day of intake, both were (or became) aware that Bild had potentially attempted suicide that evening.  That day, Bild was placed on HO watch status, but not SCW.  Plaintiff further points out that neither Nelson nor Kaphing took steps to get a more thorough mental-health evaluation or a visit with a medical doctor at intake or thereafter, even after Bild's watch status was elevated to SCW.  In addition, the nurses did not attempt to keep Bild in the "multi-hold" cell and stood by as Bild was placed in the C400 cellblock, a unit that presented the opportunity for Bild to jump to his death.  With respect to Kaphing, Plaintiff submits evidence that Kaphing reduced Bild's

watch status back to HO despite Bild's continued "significant" risk of suicide and that she failed to increase his watch status even after his mental state worsened on June 29.

After careful review of the record, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that fact issues preclude summary judgment on qualified immunity. Plaintiff has raised a genuine issue of material fact regarding both Nelson's and Kaphing's knowledge of Bild's substantial risk of suicide and mental health needs. Nelson and Kaphing both met with Bild at intake, when he was soaked in gasoline and suffering burn injuries. Both were aware that Bild may have attempted suicide. These facts raise a reasonable inference that both nurses knew that Bild presented a substantial risk of suicide and was in serious need of mental-health services. Second, the Court concludes that Plaintiff has raised a genuine issue of material fact regarding Nelson's and Kaphing's deliberate indifference—namely that they failed to take reasonable steps to abate Bild's suicide risk and address his mental-health needs. Neither Nelson nor Kaphing sought emergent mental-health care, reached out to the jail's contracted mental-health provider, or even placed Bild on the list of inmates to be seen by a doctor. In addition, neither Nelson nor Kaphing took any action to remove Bild from the C400 cellblock, despite the fact that it presented stairway access and, therefore, the opportunity for Bild to jump. Moreover, Kaphing reduced Bild's watch status despite facts suggesting that he remained a suicide risk, even when she simultaneously restricted Bild from having a razor because of the fear he would harm himself. Finally, the record contains facts showing that Bild's mental state had deteriorated on June 29, yet his watch status was not increased. These facts alone preclude summary judgment with respect to

Plaintiff's claims against Nelson and Kaphing. Instead, a reasonable fact finder could conclude that Nelson and Kaphing acted with deliberate indifference in assessing Bild. And because prisoners have a clearly established right to be protected from known risks of suicide and to have their serious medical needs addressed, qualified immunity is not available and summary judgment is denied.

### B.   Correctional Officers

Plaintiff argues that COs Schlief, Capra, Scheele, and Stellmach were deliberately indifferent. Plaintiff argues that there is ample evidence in the record to demonstrate that each knew of Bild's suicide risk and that C400 cellblock was where inmates with mental-health issues or suicide ideation were held. Plaintiff also argues that each failed to take reasonable (and simple) steps to abate Bild's suicide risk.

Defendants argue that each CO is entitled to qualified immunity. Defendant argues that CO Schlief was not deliberately indifferent to Bild's suicide risk because it was reasonable for her to rely on the medical staff's assessment and that her placement of Bild for housing in the C400 cellblock was reasonable because it was used for inmates on close observation. Defendants argue that Sergeant Capra was aware of Bild's watch status after intake, that he was not involved in Bild's housing assignment, and that he too reasonably relied on the nurses who evaluated Bild. Defendants also argue that COs Scheele and Stellmach, who first interacted with Bild on June 29, did not have knowledge of a specific threat of suicide by Bild and that any argument of deliberate indifference is improperly based on hindsight.

24

Plaintiff maintains that none of the CO Defendants are entitled to qualified immunity. Specifically, Plaintiff points to evidence that CO Schlief knew of Bild's suicide risk when she booked him, namely that Bild was on SCW and in a suicide gown, the room smelled of gasoline, and CO Schlief completed an intake questionnaire wherein Bild acknowledged, among other things, that he felt like killing himself and had tried to do so before coming to jail. Plaintiff argues that Sergeant Capra ignored similar red flags that were present during Bild's admission to the jail, observed Bild in a suicide gown before June 29, accessed Bild's electronic file and observation forms, knew of Bild's watch status, and was aware that Bild's calls to his mother and sister had been blocked. Plaintiff further points out that, despite these facts, neither CO Schlief nor Sergeant Capra sought any mental-health care for Bild and placed Bild in the C400 cellblock.

Plaintiff also points to evidence that both COs Scheele and Stellmach learned that Bild was listed as HO status, understood that this status related to mental-health issues, and later witnessed Bild walk up the stairs to the second floor in what appears to have been a trial run of his suicide. Despite this knowledge and Bild's behavior, neither took any action, such as reporting Bild's behavior to a Sergeant or a nurse, locking Bild down, or seeking a mental-health evaluation.

After careful review of the record, and viewing the facts in the light most favorable to Plaintiff, the Court concludes that fact issues preclude summary judgment on qualified immunity for each of the individual Defendants. Plaintiff has raised a genuine issue of material fact regarding each COs knowledge of Bild's substantial risk of suicide. Further, a reasonable fact finder could conclude that despite knowledge that Bild was a

suicide risk, each CO failed to take reasonable steps to abate that risk. Specifically, that Bild was assigned to and remained in C400 after expressing suicidal ideation and despite the known risk of jumping as a means of suicide could be found to show deliberate indifference. In addition, Scheele's and Stellmach's failure to take any action after they witnessed Bild climb the stairs in C400, could also lead a jury to reasonably find deliberate indifference. Thus, qualified immunity is unavailable to these Defendants and summary judgment is denied.

## IV.   *Monell* Claim

Plaintiff also claims that Washington County is subject to liability under 42 U.S.C. section 1983 because the WCJ's policies and customs caused a deprivation of Bild's constitutional rights. First, Plaintiff argues that WCJ engaged in a custom of housing suicidal and mentally-ill inmates in the C400 cellblock, which had an open and accessible staircase, when it was also aware of jumping incidents among inmates and were on notice that its procedures and barriers were inadequate. Second, Plaintiff argues that WCJ improperly designated responsibility for placing inmates on or off suicide watch to the jail nurses because the nurses lacked specialized training and were not mental-health practitioners.

In a section 1983 action, a political subdivision, such as Washington County, may only be held liable for constitutional violations that result from a policy, custom, or practice of the county. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). This claim requires evidence that a policy or custom "evince a deliberate indifference toward the constitutional rights of the inmate." *Nadeau v. Shipman*, 471 F.

26

Supp. 3d 952, 977 (D.N.D. July 2, 2020) (citing *A.H. v. St. Louis Cnty., Mo.*, 891 F.3d 721, 728 (8th Cir. 2018)).  The custom or policy must be the moving force behind the violation of an inmate's constitutional rights.  *See Corwin v. City of Indep.*, 829 F.3d 695, 700 (8th Cir. 2016).  A policy is a deliberate choice made by a policymaking official, and a custom is an unofficial practice that policymakers either tacitly authorize or to which they are deliberately indifferent.  *Id.*

Here, the Court finds that there are fact issues with respect to whether *Monell* liability attaches.  In particular, viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that WCJ was aware that the barriers on the stairways in C400 were inadequate to prevent a suicidal inmate from jumping, yet they failed to fortify the barriers and continued to house mentally ill and suicidal inmates on that cellblock.  Defendants argue that Bild was the only inmate to commit suicide by jumping in C400, but that fact does not resolve the factual issue.  The barriers present in C400 when Bild jumped appear to be the same as those in another cellblock (B200), where an inmate had previously climbed and threatened to jump.  (Heinen Dep. at 33-34; Heinen Decl. ¶ 15.)  In addition, the Court finds that fact issues remain as to whether the WCJ's practice of delegating the responsibility of placing and/or removing inmates from suicide watch to the nurses, instead of a trained mental-health professional, amounts to deliberate indifference.

## CONCLUSION

The Court concludes that fact issues remain with respect the deliberate indifference of the individual defendants and the *Monell* claim against Washington

County.  The Court cautions that victory at the summary judgment stage does not guarantee success at trial.  The Court urges the parties to attempt to settle this matter.

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [29]) is **DENIED**.


Dated:  October 18, 2021                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge